UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| A.H., et al., | ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Case No. 4:14-CV-2069 (CEJ) |
| ST. LOUIS COUNTY, MISSOURI, et al., | ) ) ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the court on defendants' motion for summary judgment [Doc. #112], pursuant to Fed. R. Civ. P. 56(a). The issues are fully briefed.

I. **Background**

On November 1, 2012, Jereme Hartwig was confined in the St. Louis County jail for a probation violation. As part of the jail's intake procedure, Mr. Hartwig was assessed by a nurse who filled out an intake medical history form. [Doc. #113, ¶31]. According to the form, Mr. Hartwig reported that his chief complaints at that time were asthma and depression, conditions for which he had previously received treatment. [Doc. #113, ¶32]. He denied being suicidal and denied any use of alcohol or drugs. [Doc. #113, ¶31]. On September 1, 2011, one year prior to his detention in the jail, Mr. Hartwig had attempted suicide by hanging himself in the garage of his mother's residence. At some point during Mr. Hartwig's confinement jail staff became aware of his previous suicide attempt. [Doc. #113, ¶35].

On December 11, 2012, Mr. Hartwig was referred to the jail's mental health division due to his history of suicide attempts. [Doc. #113, ¶37]. On January 14, 2013, Mr. Hartwig saw a psychiatrist who found no indications of suicidal intent and

that Mr. Hartwig had received medication because he was depressed and having problems adjusting to incarceration. [Doc. #113, ¶38]. The psychiatrist also noted that Mr. Hartwig had a history of substance abuse and that he was facing charges for failure to pay child support. [Doc. #113, ¶38]. The psychiatrist determined that Mr. Hartwig needed no medication at the time and he did not enter an order of designation of suicide risk status for Mr. Hartwig. [Doc. #113, ¶38].

On January 28, 2013, Mr. Hartwig had a personal visit with Savannah Cobb, the mother of his child. [Doc. #113, ¶39]. During the visit, Ms. Cobb told Mr. Hartwig that she was ending their relationship. [Doc. #113, ¶39]. Mr. Hartwig then starting hitting himself on the head with the telephone receiver. [Doc. #113, ¶39]. He was taken to the jail infirmary where sutures were placed to close the wound. [Doc. #115, pp. 14-15]. Although he was observed to be visibly upset, Mr. Hartwig "[c]ontinue[d] to insist to staff that he's 'not suicidal'." [Doc. 115, p. 15].

On January 29, 2013, Mr. Hartwig saw defendant Wendy Magnoli, Ph.D., a clinical psychologist, for a psychological evaluation. [Doc. #115, pp. 11-12]. He told Dr. Magnoli about his prior suicide attempt in 2011, but stated that he had had no suicidal ideation since that time. [Doc. #113, ¶¶63-64]. Mr. Hartwig identified a number of stressors, including that he had been in prison off and on for 15 years for nonpayment of child support, that he was currently incarcerated for a drug case, and that he was in significant debt due to legal fees and accumulated child support. After conducting an assessment, Magnoli concluded that Mr. Hartwig presented a "low risk of harm" to himself and to others. [Doc. #115, p. 12]. She directed that he be placed on precautionary status, discharged from the infirmary, and referred to a social worker for supportive follow-up. [Doc. #113, ¶78]. Magnoli did not

2

recommend further treatment from a psychiatrist because she believed Mr. Hartwig's risk of suicide was low. [Doc. #113, ¶78-79].

In 2012 and 2013, St. Louis County had in place a written suicide prevention policy, Policy 906. [Doc. #113, ¶26]. According to the policy, inmates at risk for suicide are classified as high, medium, and precautionary, based on the degree of risk they present. [Doc. #113, ¶27]. High and medium risk inmates are housed in one-person cells in the psychiatric infirmary. [Doc. #113, ¶28-29; Doc. #170, ¶199]. High risk inmates are not allowed to have regular bedsheets, and they are to be observed every five minutes on an irregular schedule. [Doc. # 170, ¶262; Doc. #170-2, p. 8]. Medium risk inmates are to be observed every 15 minutes on an irregular schedule. [Doc. #170-2, p. 9]. The suicide prevention policy requires an initial screening of inmates for suicide risk at intake to the jail, and a follow-up with a more comprehensive medical assessment within fourteen days of the initial screening. [Doc. #113, ¶30].

Mr. Hartwig was placed on precautionary status under Policy 906, a decision made by Magnoli. [Doc. #113, ¶26]. Inmates classified as precautionary are housed in the general population. [Doc. # 113, ¶29]. The policy requires that they be "*housed with a cellmate at all times*." [Doc. # 170-2, p. 13 (italics in original)]. The policy, however, does not require that the cellmate be present in the cell with the precautionary status inmate at all times. Precautionary status inmates in general population are to be observed at least once an hour during the first and second shifts, and at least once every 40 minutes during the third shift. [Doc. #170-2, p. 13]. If a precautionary status inmate is in the infirmary, however, the monitoring is done every 30 minutes. [Doc. #170-2, p. 13]. Precautionary risk

3

inmates are to be re-evaluated by the mental health staff every three weeks in order to determine whether any change should be made to their status. [Doc. # 170-2, p. 14] to

After Mr. Hartwig was discharged from the infirmary, he returned to general population. [Doc. #113, ¶93]. At approximately 7:25 p.m. on February 5, 2013, defendant Lauren Abate, a corrections officer, was conducting her tour of the general population cellblock. [Doc. #113, ¶134]. At the time of her tour, inmates in the cellblock were allowed to leave their cells and go to the day room. [Doc. #113-1, ¶31]. In her deposition, Abate testified the she did not "specifically recall noticing" Mr. Hartwig. [Doc. #159-1, p. 45]. However, in her subsequent affidavit, Abate states that she remembers seeing Mr. Hartwig alone in his cell. [Doc. #113-1, ¶30]. Approximately 50 minutes later, Abate let Mr. Hartwig's cellmate into the cell. The inmate then exited and reported to Abate that Mr. Hartwig had hung himself. [Doc. #113-1, ¶35]. Abate knew that Mr. Hartwig was on precautionary status. [Doc. #113, ¶18]. She also knew that the jail policy prohibiting precautionary status inmates from being alone in their cells did not apply during the hours that inmates were allowed to go to the day room. [Doc. #113-1, ¶34].

Mr. Hartwig had hung himself by anchoring his bed sheet to his bunk. [Doc. #170-1, p. 3]. Responding officers attempted to resuscitate him, but to no avail. [Doc. #170-1, p. 3]. He was then transported to a nearby hospital where he died on February 11, 2013. [Doc. #170-1, p. 3].

At all relevant times, defendant Herbert Bernsen was the director of the St. Louis County Department of Justice Services. In that capacity, Bernsen was responsible for the operations of the St. Louis County jail and was the "final policy

making authority for policies that were in place in 2013," including the suicide prevention policy. [Doc. #113-3, ¶¶1, 17, 39]. Bernsen did not have any personal involvement in the decisions regarding Mr. Hartwig's mental health treatment, his suicide risk status, or his housing. [Doc. #113-3, ¶18].

In a three-year period before Mr. Hartwig's death, there had been two suicides in the St. Louis County jail, both by means of hanging using a bed sheet. [Doc. #170, ¶275-276]. In each incident, the inmate was being housed in the segregation area of the jail on the 8th floor. [Doc. #113, ¶143]. The first suicide, which occurred on October 4, 2010, involved an inmate who had used the holes in the vent in his cell to create a noose. [Doc. #170, ¶277; Doc. # 170-7, p. 67]. In response, changes were made to the vents inside the cells on the 8th floor and in the infirmary. [Doc. #170, ¶279-280]. The vents in the cells on the 5th floor, where Mr. Hartwig committed suicide, were not changed. [Doc. #170, ¶281]. After the 2010 suicide, Defendant Bernsen did not order any kind of inspection of the jail cells to look for other places a sheet could be anchored so an inmate could hang themselves. [Doc. #170, ¶283]. On July 17, 2012, a second inmate hung herself by tying a bedsheet to a bookshelf in her cell. [Doc. #170, ¶276]. In response to that incident, shelves were removed from inside the cells on the 8th floor only. [Doc. #170, ¶284]. Neither of the individuals who successfully committed suicide was on suicide precaution at the time, or had been identified as suicidal. [Doc. #113-3, ¶32]. Mr. Hartwig was the first inmate on precautionary status to successfully commit suicide since the jail opened in 1998. [Doc. #113, ¶149].

From May 2008 to February 1, 2013, there were also 22 attempted suicides

5

in the St. Louis County jail. [Doc. #170, ¶285]. Sixteen of these attempts were by means of hanging using a bed sheet. [Doc. #170, ¶286]. On October 22, 2012, an inmate attempted suicide using a bed sheet anchored the bed sheet on his bunk, similar to the means used by Mr. Hartwig. [Doc. #170, ¶287]. Defendant Bernsen was aware of all the attempted and successful suicides. He did not always order an internal investigation on attempted suicides. [Doc. #170, ¶288-290]. In response to Mr. Hartwig's suicide, Policy 906 was revised so as not to permit a precautionary risk inmate in general population to be left in his cell alone at any time. [Doc. #170, ¶271]. The suicide policy was revised again in 2015 to require inmates designated as precautionary risk to be housed at all times in a cell close to a corrections officer's work station. [Doc. #170, ¶275].

****

Plaintiffs are the mother and children of decedent Hartwig. They bring this action pursuant to 42 U.S.C. § 1983 and Missouri law. In Count I of the amended complaint, plaintiffs claim that Magnoli, Abate and Bernsen were deliberately indifferent to Mr. Hartwig's mental health care needs, in violation of the Fourteenth Amendment. In Count III, plaintiffs claim that defendant St. Louis County failed to have an adequate suicide prevention policy and training program, in violation of the Fourteenth Amendment. In Count V, plaintiffs assert a wrongful death brought claim against all defendants. Counts II and IV were dismissed earlier for failure to state a claim.

## II. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed. R. Civ. P. 56(e)). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III. Discussion

#### A. Count I – Deliberate Indifference

In Count I, plaintiffs assert that the individual defendants were deliberately indifferent to Mr. Hartwig's mental health care needs, in violation of the Fourteenth Amendment. A claim of deliberate indifference under § 1983 requires proof that the prison officials actually knew of a substantial risk of serious harm and that they failed to respond reasonably to abate that risk. *Olson v. Bloomberg*, 339 F.3d 730,

7

735 (8th Cir.2003); *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). There is no question that suicide constitutes a substantial risk of serious harm. *See Gregoire*, 236 F.3d at 417 ("[A] risk of suicide by an inmate is a serious medical need."). However, the deliberate indifference analysis focuses on the particular risk of suicide posed by a specific prisoner, rather than on the generalized threat of suicide among the population of prisoners as a whole. *Hott*, 260 F.3d at 905. Thus, plaintiffs must demonstrate the defendants actually knew of that Mr. Hartwig presented an substantial risk of suicide and deliberately disregarded that risk by failing to take reasonable steps to prevent the harm from occurring. *Vaughn v. Greene Cnty., Ark.*, 438 F.3d 845, 850 (8th Cir.2006).

### **Magnoli**

The evidence establishes that Magnoli met once with Mr. Hartwig and determined that he presented a low risk of suicide. She reached this conclusion after reviewing his medical record and conducting a psychological assessment. In an exercise of professional judgment, Magnoli ordered that Mr. Hartwig be placed on precautionary status, as opposed to high or medium risk status. Plaintiffs contend that Magnoli was deliberately indifferent because she either missed or failed to properly consider certain warning signs (*e.g.*, Mr. Hartwig's history of attempted suicide, his recent traumatic experiences, and his self-inflicted harm) indicating that Mr. Hartwig presented a substantial risk of suicide.

An incorrect suicide risk assessment is not a demonstration of deliberate indifference to the risk of suicide. *See Minix v. Canarecci*, 597 F.3d 824, 828–29, 833 (7th Cir.2010) (concluding a nurse's decision to remove a pretrial detainee from a suicide watch and from medical segregation despite knowing the inmate had

twice attempted suicide, once in the previous month, did not show deliberate indifference, even if the decision showed poor judgment). Deliberate indifference requires more than poor judgment or an incorrect diagnosis. *See Drake v. Koss*, 445 F.3d 1038, 1042 (8th Cir.2006) ("Deliberate indifference is akin to criminal recklessness and requires something more than mere negligent misconduct."); *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir.2006) ("A showing of deliberate indifference is greater than gross negligence."); *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir.1993) (explaining "deliberate indifference requires a highly culpable state of mind approaching actual intent").

The plaintiffs have presented no evidence that Magnoli's actions rise to the level of gross negligence and there is no showing that Magnoli had a highly culpable state of mind evincing actual intent to cause harm. Further, there is no evidence of a failure to take reasonable steps to abate Mr. Hartwig's suicide risk. That Mr. Hartwig took his life despite Magnoli's evaluation and recommended treatment does not demonstrate that she was deliberately indifferent. The Court finds that Magnoli is entitled to judgment as a matter of law on the claim in Count I.

### **Abate**

A jailer who knows that an inmate is at risk of suicide can be held liable for deliberate indifference if she fails to check on the inmate. *Olson*, 339 F.3d at 736. It is important to note, however, that mere negligence on the part of the prison guards is "insufficient to rise to a constitutional violation." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997).

Abate knew that Mr. Hartwig was on precautionary status suicide risk. She also knew that he had injured himself a week prior to the date he committed

9

suicide. The evidence establishes that Abate conducted hourly checks on inmates, including Mr. Hartwig, as required by the jail's suicide prevention policy. Even if there were evidence that she was negligent in performing her duties, such would not support a deliberate indifference claim. The Court finds that Abate is entitled to judgment as a matter of law on Count I.

**Bernsen**

The plaintiffs allege that Bernsen, as director of the jail, was deliberately indifferent to Mr. Hartwig's constitutional rights because he failed to eliminate the means by which Mr. Hartwig committed suicide despite previous successful and attempted suicides by hanging occurring in the jail.

"Prison supervisors cannot be held liable for the actions of individual officers under § 1983 on a theory of respondeat superior." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir.2010). Prison supervisors can, however, incur liability for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference or tacit authorization of the violative practices. *Luckert v. Dodge Cty.*, 684 F.3d 808, 817 (8th Cir.2012). In order to hold a prison supervisor liable for a constitutional violation the plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996). This requires a showing that the supervisor had notice that the policies, training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id*. Typically, a single incident, or a series of isolated incidents, provides an insufficient basis upon which to assign supervisory liability, however this calculus is not rigid and must change depending on the seriousness of the incident and likelihood of

discovery. *Wever v. Lincoln Cty., Nebraska*, 388 F.3d 601, 607 (8th Cir. 2004). The question for the court to consider is whether Bernsen had notice that the suicide prevention policies, training procedures or supervision were inadequate and likely to results in a constitutional violation.

In *Wever*, the court affirmed the denial of summary judgment to a prison supervisor on plaintiff's claim for individual liability against the supervisor, "in large part because he 'did not present any evidence showing what training procedures, if any, were in place for handling potentially suicidal detainees or inmates, nor did he present any evidence showing what steps, if any were taken following' an earlier suicide that had occurred during his term as sheriff." *Wever*, at 605. The supervisor was aware of two prior suicides in the jail, one in 1999 while he was supervisor and one in 1966 before his term began, yet made no revisions to jail policies to prevent future suicide attempts similar to those prior suicides. *Id*.

Here, St. Louis County jail had clearly defined training procedures and policies for dealing with potentially suicidal detainees and inmates. Deposition testimony provided by defendants show that employees of the jail were trained to deal with potentially suicidal inmates. Further, Bernsen has proffered evidence showing specific steps the jail has taken during his term to address future suicide attempts similar to prior suicides. Following the two suicides, Bernsen and the jail conducted a review to determine how to address their failure to protect their inmates from harm, and to prevent future inmates from also committing suicide. In addition, Bernsen and the jail took steps to remedy the conditions that were conducive to the inmates' suicides by removing vents and shelves from segregation and infirmary cells. Bernsen was also aware of the 16 attempted suicides by means

11

of hanging using a bed sheet which were not addressed in the same fashion as the successful suicides. Ultimately, this failure to address attempted suicides does not rise to the level of deliberate indifference or tacit authorization to commit a constitutional violation. Completed suicides put Bernsen on notice that the suicide prevention policy may have been inadequate. Bernsen and the jail subsequently rectified the suicide prevention policy to address concerns that had previously gone unanswered. Attempted suicides are distinguishable, because they indicate that the policy was successful in preventing suicide. In those situations, the jail did not deprive the inmate of his constitutional right to be protected from serious medical harm. Because there was no deprivation of constitutional rights in circumstances where inmates were prevented from committing suicide, Bernsen cannot be deemed indifferent or to have tacitly authorized violations of inmates' constitutional rights by not changing the suicide prevention policy. Accordingly, summary judgment in favor of Bernsen is proper on plaintiffs' claim that Bernsen failed to protect Mr. Hartwig from the known risk of suicide.

### B. Qualified Immunity

The individual defendants have raised the defense of qualified immunity. Qualified immunity protects public officials from damage actions if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two inquiries are necessary in determining whether an individual is protected by qualified immunity. *Wever v. Lincoln County, Nebraska*, 388 F.3d 601, 605 (8th Cir.2004); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court must ask: (1) taken in the light most favorable to the party asserting the injury, do

the facts alleged show the officer's conduct violated a constitutional right and (2) whether the constitutional right was clearly established in light of the specific context of the case? *Saucier*, 533 U.S. at 201. As a pretrial detainee, Mr. Hartwig had a clearly established constitutional right to be protected from the known risks of suicide. *Wever,* 388 F.3d at 605–06 (citing *Yellow Horse v. Pennington County*, 225 F.3d 923, 927 (8th Cir.2000)).

Thus, the court must now evaluate whether, when viewed in the light most favorable to the plaintiff, the alleged facts show the official's conduct violated Mr. Hartwig's constitutional rights. *Vaughn*, 438 F.3d at 850-851. In the jail suicide context, qualified immunity is appropriate when a plaintiff has failed to show that his jailers violated his constitutional rights by acting deliberately indifferent to the risk of his suicide. *Luckert*, 684 F.3d at 817 (citing *Rellergert by Rellergert v. Cape Girardeau Cnty., Mo.*, 924 F.2d 794, 796 (8th Cir.1991)). To establish deliberate indifference, plaintiffs must demonstrate "the official actually knew of the risk and deliberately disregarded it." *Vaughn*, 438 F.3d at 850. As discussed above, the Court finds sufficient evidence that Magnoli and Abate did not act with deliberate indifference to the risk of Mr. Hartwig committing suicide. Furthermore, the Court finds that Bernsen was unaware that Mr. Hartwig was at risk of suicide. Accordingly, all three individual defendants are entitled to qualified immunity.

### C. Count III – Municipal Liability - St. Louis County

Plaintiffs allege that St. Louis County failed to have adequate suicide prevention policies in place resulting in the suicide of Mr. Hartwig. Specifically, the plaintiffs allege that Policy 906 was inadequate for handling inmates who were on precautionary status.

Under § 1983, a municipality may only be held liable for constitutional violations which result from a policy or custom of the municipality. *Yellow Horse*, 225 F.3d at 928. The Eighth Circuit has held that the liability of a municipality for failure to have adequate suicide prevention policies in place is appropriately analyzed under the failure to train standard set forth in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). *Id.* In resolving the issue of a city's liability, the focus must be on: (1) the adequacy of the policies in relation to the tasks the particular officers must perform and (2) the identified deficiency in a city's policy must be closely related to the ultimate injury. *City of Canton*, 489 U.S. at 390-391. Under *Canton,* a failure to train claim may only serve as a basis for § 1983 liability when the failure to train can be said to constitute deliberate indifference to the rights of others. *Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir.1998). A policy intended to address an inadequacy cannot then also be deliberately indifferent to that inadequacy. *Russell v. Hennepin Cty.*, 420 F.3d 841, 847–48 (8th Cir.2005) (citing *Liebe,* 157 F.3d at 579). While the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, courts have been unable to say that the law is established with any clarity as to what those measures must be. *Rellergert*, 924 F.2d at 797. Courts have looked to affirmative and deliberate steps to prevent inmate suicides as evidence that a municipality was not deliberately indifferent to the rights of their inmates. *Id.*; *see also Tiessen v. Cty. of Pine*, No. CIV.98-2594PAM/RLE, 2000 WL 34494819, at *6 (D. Minn. Aug. 14, 2000), *aff'd sub nom. Tiessen v. Cty. of Pine, MN*, 15 F. App'x 388 (8th Cir.2001) (finding that by placing the inmate in an audio-equipped holding cell, removing implements by which he could have strangled himself, and by

checking on his condition numerous times, the county could not be said to have been "deliberately indifferent" to the risk the inmate posed to himself). The Eighth Circuit has also previously looked to the existence of suicide prevention policies as indications of affirmative steps to prevent inmates' suicides. *Liebe*, 157 F.3d at 579.

Here, St. Louis County's policy was to designate potentially suicidal jail inmates according to the level of risk they presented and to tailor the monitoring of the inmates according to their risk level. Jail staff received training on suicide prevention and observations to make regarding inmates who were at risk. As the Eighth Circuit determined in *Liebe*, a policy cannot both be an effort to prevent suicides and, at the same time deliberately indifferent to suicides. 157 F.3d at 579; *see also Rellergert*, 924 F.2d at 797; *Kelley v. Bradford Cty.*, No. 3:07-CV-1531, 2010 WL 1136313, at *8 (M.D. Pa. Mar. 23, 2010) (finding that a municipality having a suicide prevention policy in jail was incompatible with deliberate indifference). Plaintiffs argue that St. Louis County's policy was inadequate because it permitted an inmate on precautionary status to be left alone in his cell. Inadequacy of a policy does not rise to the level of deliberate indifference when the policy demonstrates measures taken to prevent the occurrence of inmate suicides.

The Court concludes that St. Louis County's policy was not deliberately indifferent to the risk of suicide. Therefore, St. Louis County is entitled to judgment as a matter of law on Count III.

### D. State Law Claim

Plaintiffs have also asserted a claim against the defendants based on the Missouri wrongful death statute, Mo. Rev. Stat. § 537.080. Defendants argue

15

that St. Louis County is entitled to sovereign immunity and that the individual defendants are entitled to official immunity. Alternatively, defendants argue that plaintiffs cannot prove any breach of duty to Mr. Hartwig, an essential element of a wrongful death claim.

### **Sovereign Immunity**

A public entity such as St. Louis County is entitled to sovereign immunity except for claims arising from negligent operation of motor vehicles and dangerous conditions of property. *State ex rel. Bd. of Trustees of City of N. Kansas City Mem'l Hosp. v. Russell*, 843 S.W.2d 353, 358 (Mo. 1992); Mo. Ann. Stat. § 537.600. If the injury falls within these categories, the defendant is not entitled to immunity. *Id.* To benefit from the statutory waiver of sovereign immunity for injuries resulting from dangerous conditions of public property, plaintiffs must prove four elements: (1) that the property was in dangerous condition at the time of the injury, (2) that the injury directly resulted from the dangerous condition—that is, that the dangerous condition was the proximate cause of the injury, (3) that the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury that was incurred, and (4) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition. *Hensley v. Jackson Cty.*, 227 S.W.3d 491, 496 (Mo. 2007). "Direct result" is synonymous with "proximate cause," or a "cause which directly, or with no mediate agency, produces an effect." *Harden ex rel. Estate of Travis v. St. Louis Cty.*, No. 4:04-CV-602(CEJ), 2005 WL 1661505, at *3 (E.D. Mo. July 5, 2005) (quoting *Dale v. Edmonds*, 819 S.W.2d 388, 390 (Mo.Ct.App.1991)).

Suicide is a new and independent intervening act that breaks the causal connection between a negligent act and death. *Harden ex rel. Estate of Travis*, at *3 (citing *Eidson v. Reproductive Health Services,* 863 S.W.2d 621, 627 (Mo.Ct.App.1993)). Mr. Hartwig's act of committing suicide constitutes a breach of the causal connection between the dangerous condition and death. Therefore, St. Louis County is entitled to sovereign immunity under Missouri law.

### **Official Immunity**

Under Missouri law, public officials exercising discretionary duties, as opposed to ministerial duties, are entitled to official immunity from suit for all discretionary acts unless the officials acted in bad faith or with malice, which ordinarily requires actual intent to cause injury. *Austell v. Sprenger*, 690 F.3d 929, 938 (8th Cir.2012) (citing *State ex rel. Twiehaus v. Adolf,* 706 S.W.2d 443, 446–47 (Mo.1986) (en banc)); *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008), *as modified on denial of reh'g* (Sept. 30, 2008). The official immunity doctrine does not provide public employees immunity for torts committed when acting in a ministerial capacity. *Southers*, 263 S.W.3d at 610. Whether an act can be characterized as discretionary depends on the degree of reason and judgment required. *Id.* "A discretionary act requires the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued." *Id.* "A ministerial function, in contrast, is one of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Id.* The determination of whether an act is discretionary or ministerial

17

is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity. *Id.*

In their response to defendants' summary judgment motion, plaintiffs do not contest that Bernsen exercises discretionary judgment in his position. As the Director of the Department of Justice Services for St. Louis County, Bernsen exercised discretionary judgment in running operations and developing policy for the jail. Under Missouri law, bad faith or malice requires actual intent to cause injury, intentional doing of a wrongful act without legal justification or excuse, and done knowingly and deliberately, for an improper motive. *Stephens v. Dunn*, 453 S.W.3d 241, 251 (Mo. Ct. App. 2014), *reh'g and/or transfer denied* (Feb. 5, 2014), *transfer denied* (Apr. 29, 2014). The plaintiffs have presented no evidence that Bernsen was even aware of Mr. Hartwig, much less acted toward him in bad faith or with malice. Accordingly, this Court finds that Bernsen is entitled to official immunity.

Magnoli also is entitled to official immunity under Missouri law. Plaintiffs in their response did not contest that Magnoli exercises discretionary judgment in her position. Magnoli spoke with Mr. Hartwig, reviewed his medical history and exercised her professional judgment in designating Mr. Hartwig as precautionary status. As a psychologist, she exercised discretionary judgment in the performance of her duty in evaluating Mr. Hartwig. Public officials exercising discretionary duties are entitled to official immunity from suit for all discretionary acts unless the officials acted in bad faith or with malice, which ordinarily requires actual intent to

cause injury. *Austell*, 690 F.3d at 938 (citing *State ex rel. Twiehaus,* 706 S.W.2d at 446–47). Magnoli's decision to place Mr. Hartwig on precautionary status required the exercise of reason and discretion and revolved around the exercise of her professional judgment. The plaintiffs have presented no evidence that Magnoli acted in bad faith or with malice.

Under Missouri law, public officials engaging in ministerial duties imposed by statute or regulation are not entitled to official immunity. *Austell*, 690 F.3d at 938 (citing *State ex rel. Twiehaus*, 706 S.W.2d at 446–47); *see also Boever v. Special Sch. Dist. of St. Louis Cty.*, 296 S.W.3d 487, 492 (Mo. Ct. App. 2009). To be liable for official acts, a public official or employee must breach a ministerial duty imposed by statute or regulation. *Boever*, 296 S.W.3d at 492. As a corrections officer, Abate was mandated by jail regulations to engage in hourly checks of inmates on precautionary status. This obligation was not discretionary. The record shows that Abate performed her ministerial duty to conduct hourly checks. Because there is no evidence that Abate breached her ministerial duty, she is entitled to official immunity.

\* \* \* \* \*

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the defendants' motion for summary judgment on Counts I, III, and V of the amended complaint [Doc. #112] is **GRANTED**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 25th day of January, 2017.